# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| DR. NESAR U. AHMED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 5:14-cv-01683-JHE |
| THE BOARD OF TRUSTEES OF | ) | |
| ALABAMA AGRICULTURAL & | ) | |
| MECHANICAL UNIVERSITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION[1]

Through his third amended complaint, Plaintiff Dr. Nesar U. Ahmed ("Dr. Ahmed") brings this employment discrimination action against Defendants the Board of Trustees of Alabama Agricultural & Mechanical University (the "Board"),[2] Dr. Daniel K. Wims ("Dr. Wims"), Dr. Andrew Hugine, Jr. ("Dr. Hugine"), Dr. Chance Glenn ("Dr. Glenn"), and Dr. V. Trent Montgomery ("Dr. Montgomery") (collectively, "Defendants"). (Doc. 68). Defendants have moved for summary judgment on all of Dr. Ahmed's claims. (Docs. 111 & 112). Dr. Ahmed opposes this motion, (doc. 117), and Defendants have filed a reply brief in support, (doc. 119). For the reasons stated more fully below, the motion is **GRANTED**.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 54).

[2] Ahmed's claims against a multitude of other defendants, including individual members of the Board, have been previously dismissed. (*See* docs. 66, 67 & 68).

# I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere

2

'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

### A. Background

Dr. Ahmed, an Asian male citizen of Bangladeshi national origin, is currently a tenured professor of Civil Engineering at Alabama Agricultural and Mechanical University ("Alabama A&M" or the "University"), a historically black university ("HBCU") located in Normal, Alabama. (Doc. 68 at ¶¶ 8-9; Declaration of Dr. Nesar U. Ahmed, doc. 118-1 ("Ahmed Decl.") at ¶ 1-3; Declaration of Dr. Lloyd Walker, doc. 113-5 ("Walker Decl.") at 20-24 (Exh. B)). The University is managed by the Board, which is "a body corporate" consisting of the Governor of the State of Alabama and various trustees. ALA. CODE § 16-49-21. The remaining defendants are all members of the University's administration, at one level or another: Dr. Hugine is the President of the University, (doc. 68 at ¶ 7); Dr. Wims is the University's Provost and Vice President for Academic Affairs, (*id.*); Dr. Glenn has served as Dean of the University's College of Engineering, Technology, and Physical Sciences since July 1, 2012, (Deposition of Chance Glenn, doc. 113-4 ("Glenn Depo.") at 18 (59:15)); and Dr. Montgomery was Dr. Glenn's predecessor as Dean, (Doc. 68 at ¶ 7).

### 1. Dr. Ahmed's Qualifications

Dr. Ahmed has been employed by the University since 1988. (Ahmed Decl. at 1 (¶ 3)). Dr. Ahmed was initially hired as an Assistant Professor of Civil Engineering. (Doc. 68 at ¶ 9). In 1993, Dr. Ahmed earned tenure and was promoted to Associate Professor of Civil Engineering. (*Id.*). Dr. Ahmed was further promoted to full Professor of Civil Engineering in 1996. (*Id.*).

Dr. Ahmed has received favorable evaluation ratings from his students, the Chair, and the Dean. (Ahmed Decl. at 7 (¶ 47)). In 1996, Dr. Ahmed helped the University achieve ABET[3] accreditation for the first time for its civil engineering program. (Ahmed Decl. at 6 (¶ 42)). The program has been accredited every six years since. (*Id.*). Additionally, Dr. Ahmed and faculty from the Physics and Math Departments submitted a proposal to the National Science Foundation's STEM HBCU-Up program; as a result, the University received a $2.17 million grant for five years. (Ahmed Decl. at 7 (¶ 44)). Part of that grant provided the University with the ability to conduct Fundamentals of Engineering ("FE") review sessions for civil engineering students taking the first part of the Professional Engineers ("PE") license exam. (*Id.* (¶ 45)). Dr. Ahmed is also the primary author of two FE review books which have increased the FE passage rate dramatically. (*Id.* (¶ 46)). Dr. Ahmed has helped to recruit students, obtained a $600,000 scholarship award for underprivileged minority students, helped develop the computer lab, obtained up-to-date instrumentation and equipment for the engineering laboratory, and otherwise assisted in furthering the school's objectives. (*Id.* at 7-8 (¶¶ 47-55)).

In addition to his academic experience, Dr. Ahmed also had fifteen years of professional engineering administrative experience in a family-owned structural engineering consulting company containing forty-five engineering professionals. (*Id.* at 5 (¶ 33)). In that capacity, Dr. Ahmed was involved in budgeting, auditing, hiring employees, and dealing with their benefits and written contracts. (*Id.*).

---

[3] ABET "accredit[s] college and university programs in the disciplines of applied and natural science, computing, engineering and engineering technology at the associate, bachelor's and master's degree levels." *About ABET* (August 28, 2019), https://www.abet.org/about-abet/.

Despite Dr. Ahmed's qualifications, the University did not offer him any upper level position until 2016 (after the events giving rise to this lawsuit), when Dr. Glenn recommended Dr. Ahmed as coordinator of the civil engineering program. (Ahmed Decl. at 1 (¶ 4); Glenn Depo. at 10 (29:18-20)). Based on this recommendation, Dr. Mohammed Seif, Chair of the Mechanical and Civil Engineering Department, appointed Dr. Ahmed as Civil Engineering Program Coordinator. (Glenn Depo. at 10-11 (29:21-28:4)). Dr. Ahmed served in this role from May 2016 until January 2018, when he voluntarily stepped down due to medical reasons. (Doc. 68 at ¶ 9; Deposition of Nesar U. Ahmed, Vol. I, doc. 113-1 ("Ahmed Depo. I") at 17-18 (68:22-69:5), 58 (226:6-8)).

### 2. The University's Hiring Practices

There have been no Asians or Caucasians promoted or hired into any position of Dean or above since Dr. Hugine's administration began. (Ahmed Decl. at 8-9 (¶ 57)). There is presently one Asian (Bangladeshi) and one Caucasian (Egyptian) department chair, but both selections predated the Hugine/Wims administration.[4] (*Id.* at 9 (¶ 58)). The only hires into such positions have been Dr. Glenn (discussed further below) and Delmonzie Smith, both of whom are African-American. (*Id.* (¶ 60)).

### 3. Dr. Ahmed's Previous EEOC Charge

In 1999, Dr. Ahmed filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC"). (Doc. 68 at ¶ 10). He later filed a lawsuit, which resulted

---

[4] Dr. Ahmed also states another dean, Dean Sarkar, was replaced by an African-American, but he gives no information about Dean Sarkar's race or national origin. (*See* Ahmed Decl. at 9 (¶ 59). For summary judgment purposes, the undersigned assumes Dean Sarkar is not an African-American.

in a confidential settlement. (*Id.* at ¶¶ 10-11; Ahmed Depo. I at 16-17 (57:3-63:12). The settlement agreement is part of Dr. Ahmed's personnel file at the University. (Ahmed Decl. at 11 (¶ 71)).

Dr. Wims was not aware of the EEOC charge prior to the filing of this action, and only learned of it when he was informed of it in connection with this lawsuit.[5] (Wims Depo. at 15 (47:22-48:20)). Dr. Glenn was also unaware of it when the events related to this lawsuit occurred, and likewise only found out about it in connection with this lawsuit. (Glenn Depo. at 31 (111:6-1-15)). As of his January 9, 2019 deposition, Dr. Glenn had not reviewed Dr. Ahmed's personnel file. (Glenn Depo. at 12 (35:10-17)).

### 4. The Handbook

The University's 2011 Faculty Handbook (the "Handbook") sets out the University's policies regarding summer faculty appointments. Specifically, the Handbook states: "Since summer school is to be self-sufficient with regards to instructional and infrastructural support, it is not expected to provide employment to all faculty members who desire to teach." (Walker Decl. at 45 (Exh. B)). Summer appointments "will be made by the Provost and Vice President for Academic Affairs on recommendations made by department chairpersons through their respective deans, on the basis of teaching requirements of the summer program. (*Id.*). Compensation for a full load summer assignment is 2/9 of the faculty member's nine-month salary. (*Id.*).

The Handbook also includes provisions related to supplemental pay:

Participation in programs, projects and activities administered or conducted by the University and supported by special agreements, grants, or other types of agreements with other agencies shall be considered a part of the faculty member's responsibility to the University. Whenever a full time faculty member employed

---

[5] Dr. Ahmed points out that Dr. Wims was more equivocal about whether he ought to have been aware of the previous EEOC charge. (Doc. 117 at 10) (citing Deposition of Daniel K. Wims, doc. 113-3 ("Wims Depo.") at 15 (48:21-49:4)).

by the University, whether on a nine-month, twelve-month or other time-based appointment, the University shall be entitled to full and complete services with regard to work expectations appropriate to the job description and relative to University activities. If a faculty member participates or serves in an externally or specially funded program, project or activity within the University, whether in a primary or different department or work unit, an appropriate portion of the faculty member's regular salary shall be provided by the budget of the program, project or activity. Under the above circumstances, no increase in the faculty member's base compensation shall be allowed.

Faculty are allowed an overload maximum rate of 133% of base salary as supplement to the academic calendar.

The University recognizes that there are certain irregular, short-term University conducted activities which, because of their nature, frequency of occurrence, the associate lack of prior knowledge, and recognition of the demand for services, may need to be handled on an exceptions basis. Extra compensation will be allowed in such cases only if . . . [in addition to other conditions], [t]he work is performed in addition to a normal full load.

(*Id.* at 43-44 (Exh. B)).

The Handbook defines the full teaching load for its faculty: "The full teaching load for faculty in the undergraduate program is twelve (12) credit hours and three hundred (300) student credit hours [("SCH")] per semester." (*Id.* at 41 (Exh. B)). "The teaching load for faculty in a graduate program is nine (9) credit hours with 225 SCH per semester for master's, Ed, and EdS. courses and six (6) credit hours with 150 SCH for doctoral courses." (*Id.*).

### B. Dr. Ahmed's Discrimination Allegations

#### 1. The Dean Position

In 2012, the University announced it was searching for a new Dean of the School of Engineering, Technology, and Physical Sciences (the "Dean Position"). The job posting required

one year of experience as a departmental chair or similar position.[6] (Ahmed Depo. I at 48-49 (188:2-189:1), 153-55 (Exh. 5)). Although Dr. Ahmed possessed no experience as a department chair and had not served in any supervisory role at the University at the time, he applied for the position. (Doc. 68 at ¶ 16; Ahmed Depo. I at 28 (105:13-19), 45-46 (176:21-177:2)). Dr. Ahmed had been told by Dr. Montgomery (who had encouraged him to apply for the Dean Position) that Dr. Ahmed's experience in civil engineering would be considered the equivalent of the chair experience requirement. (Ahmed Decl. at 4-5 (¶¶ 30-35)).

Dr. Wims appointed a committee to screen and recommend candidates for the Dean Position. (Wims Depo. at 12 (36:12-17); Walker Decl. at 1 (¶ 3), 8 (Exh. A)). At Dr. Wims's request, Dr. Lloyd Walker ("Dr. Walker"), Dean of Agricultural, Life, and Natural Sciences, served as the committee's chair. (*Id.*). Dr. Wims also asked Dr. Mohan Aggarwal, a member of the Department of Physics, Chemistry, and Math, to serve as co-chair. (*Id.*). The committee included faculty from diverse backgrounds; at least one member was Bangladeshi, two were Indian, two were Chinese, and one was Iranian. (Ahmed Depo. I at 41 (157:2-160:16)). Dr. Wims did not participate in the committee's meetings or deliberations, did not review applications, and did not participate in the process of selecting finalists.[7] (Wims Depo. at 13 (39:10-18)).

---

[6] Defendants have produced, attached as exhibits to Dr. Ahmed's deposition, a job posting indicating that "the successful candidate ideally should have three or more years as a departmental chair or other such position," (Ahmed Depo. I at 153 (Exh. 5)), and a position description including the same three-year requirement, (*id.* at 154-55 (Exh. 5)). However, Dr. Ahmed testified that when he applied, there was only a one-year requirement, and the posting was later changed; without any evidence, he characterized the job posting as "fabricated*." (Id.* at 48-49 (188:2-189:1)). For summary judgment purposes, this factual dispute is resolved in favor of Dr. Ahmed.

[7] Dr. Ahmed purports to dispute this fact by arguing that the Handbook requires the Provost recommend the Dean Position to the President and be involved in the interviewing process. (Doc. 117 at 6) (citing Walker Decl. at 57-58 (Exh. B)). The Handbook does require the Provost to make

On May 10, 2012, Dr. Walker submitted a letter to Dr. Wims containing the results of the committee's search. (Walker Decl. at 4 (¶ 9), 163). The letter indicated the committee had met on several occasions and, after screening the twenty-two initial candidates and interviewing the top three candidates, unanimously recommended Dr. Reginald Perry and Dr. Glenn as candidates "who should be given serious consideration for filling" the Dean Position. (*Id.*). The third candidate who received an interview, Dr. Stephen U. Egarievwe ("Dr. Egarievwe"), was not recommended as a candidate for hiring. (*Id.*; doc. 68 at ¶ 16). Dr. Egarievwe was an associate professor with only limited professor experience in the area of basic industrial technology. (Ahmed Decl. at 6 (¶¶ 37-38)). Dr. Egarievwe had prior administrative experience as the Chair of the Engineering Technology Department, although that department had been closed and Dr.

---

a recommendation to the President, (*id.* at 57 (Exh. B, Handbook 3.6.1.3)), but it does not go so far as Dr. Ahmed says about the Provost's involvement in the process. Instead, it appears that the search committee prepares summaries for the administrative supervisor's review and eventual recommendation. (*Id.* at 57-68 (Exh. B, Handbook 3.6.2.2 & 3.6.2.3.)). Further, to the extent that Dr. Wims was "required" to be involved in the interview process, the Handbook indicates that interview schedules "<u>should allow</u> for discussions with the Vice President for Academic Affairs, members of the search committee, individual faculty, students, and others <u>as deemed appropriate to the nature of the search</u>." (*Id.* at 57-58 (Exh. B, Handbook 3.6.2.3)) (emphasis added). This broad scheduling requirement, which imposes no particular duty and places no particular expectation on the Provost, does not contradict Dr. Wims's testimony.

Dr. Ahmed also indicates that the Handbook's requirements are "consistent with Wims' instruction to the search committees of which Plaintiff was a part, that he preferred African-Americans." (Doc. 117 at 6) (citing Ahmed Depo. I at 45 (175:10-19)). The cited portion of Dr. Ahmed's testimony is that his evidence to support that the University decided to interview an African-American candidate (discussed further below) is: "Because I am on many other committees, past committee, ever time the University ask us is there any African American. Is there an African American, he should be number one on the list. It is hidden agenda. They have been practicing it for over the years." (Ahmed Depo. I at 45 (175:10-19)). Assuming this relates back to Dr. Ahmed's earlier testimony that Dr. Wims "always asked it openly, is there any African American … candidate," (*id.* at 44 (170:17-23)), it still does not place Dr. Wims's testimony in dispute.

Egarievwe removed from the position at its closure. (Ahmed Decl. at 6 (¶ 39); Ahmed Depo. I at 45-46 (176:21-177:2); Walker Decl. at 5-6 (¶ 12)). Dr. Glenn had served as Associate Dean of Graduate Studies at Rochester Institute of Technology. (Walker Decl. at 5 (¶ 12)). Dr. Perry had served as the Associate Dean of Student Affairs and Curriculum, College of Engineering, Joint College between Florida State University and Florida Agricultural & Mechanical University. (*Id.*). The University ultimately offered the position to Dr. Glenn.[8] (Glenn Depo. at 18 (59:14-15)).

In his declaration, Dr. Walker stated the committee followed the Handbook's procedures in connection with the search. (Doc. 113-5 at 3 (¶ 5)). Dr. Ahmed testified he did not know what the members of the search and selection committee discussed during their meetings, including whether they discussed another applicant's race. (Ahmed Depo. I at 42 (163:3-14)). Dr. Ahmed also denied knowledge of why the committee did not recommend him for an interview. (*Id.* at 44 (172:15-17)). However, Dr. Ahmed's declaration indicates that three members of the search committee informed him in 2012 that of the twenty-two applicants for the Dean Position, the vast majority were Asian or Caucasian.[9] (Ahmed Decl. at 4 (¶¶ 23-26)). Dr. Ahmed also indicated that

---

[8] Defendants point out that Dr. Ahmed's complaint only alleges he was more qualified than Dr. Egarievwe, not Dr. Glenn. (Doc. 112 at 20) (citing doc. 68 at ¶ 17). In his response, Dr. Ahmed disputes this and contends he was more qualified than Dr. Glenn because he "had far more experience serving the HBCU mission than Dr. Glenn." (Doc. 117 at 6). Leaving aside the inherently subjective nature of this allegation, Defendants are correct that it does not appear in Dr. Ahmed's complaint at all. A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Instead, "[a]t the summary judgment stage, the proper procedure for [a plaintiff] is to amend [his] complaint in accordance with Fed. R. Civ. P. 15(a). Nevertheless, the undersigned considers Dr. Ahmed's argument regarding Dr. Glenn's qualifications below.

[9] In their reply, Defendants argue these statements are inadmissible hearsay. (Doc. 119 at 3, 8). Although they are unquestionably hearsay, their value at summary judgment depends on whether they can be reduced to admissible form at trial. *See Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir (11th Cir. 1996); Fed. R. Civ. P. 56(c)(2). Regardless of whether Defendants

these search committee members were to "agree with Dean Walker and go along with him in decision-making because he was carrying out the requirements of the Provost." (*Id.* (¶ 27)). The search committee members informed Dr. Ahmed that the committee screened and selected ten applicants in the first round and eight in the second, but only interviewed the top three candidates (although Dr. Ahmed was fourth on the list). (*Id.* (¶ 28)). All of those candidates were African-American.[10] (*Id.*). Additionally, Dr. Montgomery was made a non-voting member of the committee. (*Id.* (¶ 29)).

Dr. Ahmed testified that he does not know whether Dr. Hugine or Dr. Wims knew that he applied for the Dean Position. (Ahmed Depo. I at 54 (209:21-211:1)).

### 2. The Salary Increase, Summer Assignments, and Supplemental Pay

In June 2012, Dr. Ahmed received an employment offer from Abu Dhabi University. (Doc. 68 at ¶ 28). The position was non-tenured, but was a one-year automatically-renewable contract (i.e., continued from year to year). (Ahmed Depo I at 64 (252:15-253:3)). In Dr. Ahmed's experience, this is the way contracts with professors are handled in the United Arab Emirates. (Ahmed Decl. at 12 (¶ 81)).

Dr. Ahmed informed Dr. Wims and Dr. Montgomery about the offer and requested a salary increase. (Doc. 68 at ¶ 29). Dr. Montgomery initially spoke with Dr. Ahmed, then Dr. Wims called him. (Ahmed Decl. at 11 (¶ 75)). Dr. Wims had asked Dr. Ahmed what it would take for

have properly presented or supported an evidentiary objection, and regardless of whether the evidence might ultimately be inadmissible, it does not alter the undersigned's conclusion. Therefore, the undersigned has considered the statements of the three search committee members.

[10] Another Asian candidate, Dr. Saha, had chair and engineering experience and was a full professor, but was also rejected in favor of Dr. Egarievwe for an interview for the Dean Position. (Ahmed Decl. at 6 (¶ 40)).

him to stay, Dr. Ahmed had replied that it would take $108,000 over nine months, and Dr. Wims

had said "OK." (Ahmed Decl. at 12 (¶ 77)). Dr. Wims indicated he would need something in

writing from Dr. Montgomery. (*Id.*). After this conversation, on June 14, 2012, Dr. Montgomery

sent Dr. Wims a letter (the "First Salary Letter") indicating that Dr. Ahmed had made a

counteroffer seeking a nine-month salary of $108,000; Dr. Ahmed received a copy of the letter,

signed only by Dr. Montgomery. (Ahmed Decl. at ¶ 76; Depostition of Nesar U. Ahmed, Vol. II,

doc. 113-2 ("Ahmed Depo. II") at 94 (Exh. 15)). Dr. Ahmed declined the Abu Dhabi University

offer on the basis of this letter. (Ahmed Depo. II at 20 (69:2-5)).

Dr. Montgomery wrote a second letter (the "Second Salary Letter") to Dr. Wims on June

14, 2012. (Ahmed Depo. II at 93 (Exh. 14)). This letter requested that Dr. Ahmed's salary "be

increased to $92,000 for the academic year and that he be given a summer assignment that will

allow him to make another 2/9 of his academic year's salary. Additionally, I am requesting that

he be allowed to take advantage of the current university policy that allows faculty members to

add up to 33 percent to their salary from externally funded projects." (*Id.*). Dr. Wims signed this

letter. (*Id.*). Dr. Ahmed had not received this letter when he declined the Abu Dhabi University

position. (Ahmed Depo. II at 21 (72:12-19)).

The University provided Dr. Ahmed with the salary increase included in the second letter.

(Ahmed Depo. I at 72 (282:9-13)). Additionally, Dr. Ahmed received summer assignments in

2013 and 2014, which allowed him to make 2/9 of his academic year's salary. (*Id.* at 282:14-21).

Dr. Wims testified both the "summer assignment that will allow [Dr. Ahmed] to make another 2/9

of his academic year's salary" and the "current university policy that allows faculty members to

add up to 33 percent to their salary from externally funded projects" were standing University

policies not specific to Dr. Ahmed. (Wims Depo. at 9 (23:7-9)). Dr. Wims characterized full

assignments over the summer as "very rare" and stated "we agreed to this for that year to insure the full assignment for that year. And I believe he received it for the subsequent year as well." (*Id.* (24:10-15)). Conversely, in his declaration, Dr. Ahmed states Dr. Montgomery's handwriting on Dr. Ahmed's copy of the second letter shows the calculation "$92,000 + 2/9*92,000 = $112,444.44," which Dr. Ahmed further states Dr. Montgomery explained to him would be the amount budgeted each year by the University for Dr. Ahmed's salary. (Ahmed Decl. at 9 (¶¶ 62-64), 45 (Exh. C)).

Dr. Glenn testified he did not understand the second letter to provide Dr. Ahmed with a recurring summer assignment every year; instead, an assignment would have to be contingent on funding. (Glenn Depo. at 13-14 (41:22-42:9)). In Dr. Glenn's understanding, the 2013 and 2014 summer assignments were meant to accommodate Dr. Ahmed, and Dr. Glenn used "money that was available and assignments that were necessary at the time" to do so. (*Id.* at 16 (52:1-2)). Dr. Ahmed admitted Dr. Glenn told him he would not receive summer assignments after 2014 because the budget did not contain funds to support this. (Ahmed Depo. I at 72 (284:7-12)). Additionally, Dr. Ahmed acknowledged that the civil engineering program does not have enough students who are interested in taking summer classes that civil engineering classes can be offered. (*Id.* at 30 (113:1-115:3)).

Non-Asian, non-Bangladeshi engineering professors received summer assignments. (Ahmed Decl. at 10 (¶ 67)). Specifically, Gerald Vines, an Afircan-American professor in the same College as Dr. Ahmed and with whom Dr. Ahmed is familiar, received summer teaching assignments during years when Dr. Ahmed did not. (*Id.*). Dr. Ahmed testified he does not know the enrollment in these summer classes, nor does he know Vines's compensation arrangement with the University. (Ahmed Depo. II at 42 (155:11-23)). Dr. Aaron Adams, an African-American

engineering professor in the same department as Dr. Ahmed who teaches courses in the same College and shares the same supervisors, received a summer assignment by agreement. (Ahmed Decl. at 10 (¶ 67)). This was a single summer assignment in 2014, a year in which Dr. Ahmed also received a summer assignment. (Wims Depo. at 85 (Exh. 8)). The agreement also stated "[s]ubsequent summer assignments will be dependent upon course needs and your ability to generate external support." (*Id.*).

Dr. Ahmed has not performed any valuable services for the University during the summer terms since 2014. (Ahmed Depo. I at 74 (291:3-10)). However, Dr. Ahmed is still eligible to receive summer assignments on request. (Wims Depo. at 85 (31:9-12)).

In addition to summer assignments, Dr. Ahmed requested supplemental pay on November 20, 2012, for conducting two-hour Fundamentals of Engineering review sessions for students taking the engineering license exam. (Doc. 68 at ¶ 32). Although the request was granted and approved in writing by the Budget Manager, Department Chairman, and Dean of the College of Engineering, Dr. Wims refused the request on the basis that Dr. Ahmed's teaching load was inadequate. (*Id.* at ¶¶ 33-34). The Handbook requires 225 SCH for a full teaching load. (Ahmed Depo. I at 57 (224:141-6)). Dr. Ahmed testified he did not meet this requirement when Dr. Wims denied his supplemental pay request. (*Id.* at 57-58 (224:7-225:19)). When Dr. Ahmed resubmitted this request, it was approved by the Budget Manager, Chair, Dean, and Dr. Wims, but Dr. Wims

later rescinded his approval. (Doc. 68 at ¶¶ 35-37). Dr. Ahmed denied knowing why he did not receive summer assignments or supplemental pay.[11] (Ahmed Depo. I at 299:3-7).

### 3. The Coordinator Position

On November 29, 2012, Dr. Glenn announced that Dr. Michael Ayokanmbi ("Dr. Ayokanmbi"), who is African-American,[12] had been appointed to the position of Coordinator of Masters' Programs of Engineering (the "Coordinator Position"). (Doc. 68 at ¶ 23). Dr. Glenn testified Dr. Ayokanmbi's position was not a new appointment. (Glenn Depo. at 5 (9:11-13:22)). Instead, Dr. Ayokanmbi had previously been "coordinator for the materiel engineering program, which is a master's of engineering degree," but the program name had been changed to be a "master's in systems and materiel engineering"; Dr. Ayokanmbi simply remained the coordinator of the newly-renamed program.[13] (*Id.*).

Dr. Ahmed did not know of this position in advance, but would have applied for this position or expressed his interest had it been advertised. (*Id.* at ¶ 24; Ahmed Decl. at 3 (¶ 10-12)). He asserts that his qualifications are superior to Dr. Ayokanmbi's. (Ahmed Decl. at 3 (¶ 17-18)). Specifically, Dr. Ahmed notes Dr. Ayokanmbi was an associate professor of only one year and,

---

[11] Dr. Ahmed purports to "clarify" this by arguing, essentially, that he has established his claims on the merits. (Doc. 117 at 9). This is not actually a clarification of Dr. Ahmed's testimony, which relates to Dr. Ahmed's knowledge, not the basis of his legal claims.

[12] There seems to be some question about Dr. Ayokanmbi's race or national origin such that he is correctly categorized as "African-American," but Defendants assume its truth for the purposes of their motion. (Doc. 112 at 25 n.3).

[13] Dr. Ahmed claims to dispute this fact on the basis that Defendants offered inconsistent responses as to whom was the decisionmaker who placed Dr. Ayokanmbi in the Coordinator Position, (doc. 117 at 9), but whether Dr. Glenn or Dr. Montgomery actually made the decision is irrelevant to how the Coordinator Position came about. To the extent this dispute is relevant, it is discussed below.

although he had taught classes regarding materiel, these were not part of the University's Engineering Department. (*Id.* (¶ 19-20)).

Dr. Glenn did not dispute Dr. Ahmed's qualifications for the position, but characterized Dr. Ayokanmbi as more qualified because his "graduate degrees are more in line to the subject matter in the program and he taught courses in the program." (Glenn Depo. at 7 (14:20-15:15)). The Coordinator Position does not come with an increase in base salary or supplemental pay. (*Id.* at 17:7-13).

### 4. Leave of Absence

On June 30, 2014, Dr. Ahmed requested and received a one-year unpaid leave of absence to accept a temporary job offer from King Abdulaziz University in Saudi Arabia. (Ahmed Depo. I at 10 (39:12-19)). This was consistent with the University's policies on sabbatical leave and leave without pay, and it was favorable for the University to develop a relationship with the Saudi university's engineering program. (Doc. 118-7 at 1-2; Walker Decl. at 105-108 (Exh. B)). The University did not require Dr. Ahmed to forfeit his tenured position as a result of taking this leave.[14] (Ahmed Depo. I at 10 (39:20-40:4)). When Dr. Ahmed requested a meeting to discuss a summer assignment in 2015, Dr. Glenn stated that, because Dr. Ahmed was "involved in legal action against the university . . . it would be better if any requests you have regarding the 2015-16 academic year be submitted to me in writing in lieu of a meeting." (Glenn Depo. at 55 (Exh. 3)).

---

[14] Dr. Ahmed attempts to dispute portions of this by stating "Plaintiff requested to come back for the summer assignment, but was not allowed to do so by Dr. Glenn because of Plaintiff's protected activity, his lawsuit against Defendants." (Doc. 117 at 10). This is a legal conclusion that does not relate to Dr. Ahmed's tenure. It also misstates the evidence, as noted in the next sentence; Dr. Glenn did not refuse to discuss the request, but instead directed Dr. Ahmed to another method of making the request.

## C. Procedural History

On February 28, 2013, Dr. Ahmed filed an EEOC charge. (Doc. 68 at ¶ 3; doc. 68-1). The EEOC charge included claims of race discrimination, national origin discrimination, and retaliation under Title VII. (Doc. 68-1). Dr. Ahmed received a right to sue letter from the Department of Justice's Civil Rights Division on June 2, 2014. (Doc. 68 at ¶ 3; doc. 68-2; doc. 68-3). On August 29, 2014, Dr. Ahmed filed this action. (Doc. 1).

## III. Analysis

Dr. Ahmed's third amended complaint contains six counts. Through the course of several amendments and motions to dismiss, (*see* docs. 67, 68 & 89), the only remaining claims are as follows. Count I is a Title VII disparate treatment count alleging race and national origin discrimination against the Board, premised on Dr. Ayokanmbi's appointment to the Coordinator Position over Dr. Ahmed,[15] (doc. 68 at ¶ 47), and the University's deprivation of Dr. Ahmed's supplemental pay and summer assignments, (*id.* at ¶ 48). Count II is a Title VII retaliation count against the Board alleging Dr. Ahmed was denied consideration for the Coordinator Position and supplemental summer salary because of his 1999 EEOC charge. (*Id.* at ¶ 54). Count III is a 42 U.S.C. § 1981 count against Drs. Hugine, Wims, and Glenn[16] in both their individual and official capacities, alleging race, ethnicity, and ancestry discrimination in failing to interview him for the Dean Position, (doc. 68 at ¶ 58), failing to promote him to the Coordinator Position, (*id.*), and

---

[15] In the third amended complaint, Dr. Ahmed also points to four Asian engineering faculty members who were allegedly better qualified than Dr. Ayokanmbi: Dr. Liaw, Dr. Alim, Dr. Deng, and Dr. Qian. (Doc. 68 at ¶ 47). Dr. Ahmed makes no argument in his brief concerning any of these faculty members' qualifications or otherwise connects them to his claims against the University.

[16] The complaint refers to Dr. Glenn as "Chance" in this count. (Doc. 68 at 19).

denying him supplemental pay in January 2013, (*id.* at ¶ 59). Count IV is a § 1981 retaliation claim against Drs. Hugine, Wims, and Glenn in their individual and official capacities, alleging they deprived him of his summer assignments in retaliation for the 1999 EEOC charge and the 2013 EEOC charge. (*Id.* at ¶ 62). Count VI[17] is an Alabama state law promissory fraud claim against Drs. Hugine, Wims, Glenn and Montgomery, in their individual capacities only,[18] regarding Dr. Ahmed's rejection of the Abu Dhabi University position, allegedly on the basis of false representations by Drs. Wims and Montgomery. (*Id.* at ¶ 72).

Defendants break the discrimination claims down into four units based on the act alleged. The "Coordinator Position Claim" includes the Title VII claim against the Board and the § 1981 claim against Drs. Hugine, Wims, and Glenn, related to the selection of Dr. Ayokanmbi as Coordinator of Master's Programs of Engineering. (Doc. 112 at 28). The "Supplemental Pay Claim" encompasses the Title VII claim against the Board and the § 1981 claim against Drs. Hugine, Wims, and Glenn for the January 2013 denial of supplemental pay. (*Id.*). The "Summer Assignment Claim" is the Title VII claim against the Board for failing to provide Dr. Ahmed with summer assignments beyond 2014. (*Id.*). And the "Dean Position Claim" consists of the § 1981 failure-to-interview claim related to the Dean Position. (*Id.*). Because the parties' briefing generally tracks that format, the undersigned follows suit below, with the promissory fraud claim discussed separately.

---

[17] Count V, a breach of contract claim, has been dismissed. (*See* doc. 89 at 12).

[18] (*See* doc. 89 at 12) (dismissing official-capacity claims against Drs. Hugine, Wims, and Glenn)).

## A. Discrimination Claims

Title VII prohibits an employer from "fail[ing] or refusin[ing] to hire or . . . discharg[ing] any individual, or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A Title VII plaintiff asserting a disparate treatment claim must show the defendant acted with discriminatory intent. *Denny v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001). "In order to show discriminatory intent, a plaintiff must demonstrate that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects on an identifiable group." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273 (11th Cir. 2000) (internal quotation marks, alterations, and citation omitted). "[T]he analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same." [19] *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citations omitted).

When a plaintiff bases his disparate treatment claims on circumstantial evidence, the court generally applies the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973). Under the *McDonall Douglas* framework, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that [he] belongs to a protected class, (2) that [he] was subjected to an adverse employment action, (3) that [he] was qualified to perform the job in question, and (4) that [his] employer treated 'similarly situated' employees outside [his] class more favorably." *Lewis v. City of Union City, Georgia*, 918 F.3d

--------

[19] Section 1981 claims are actionable via 42 U.S.C. § 1983. *See Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 735 (1989).

1213, 1220–21 (11th Cir. 2019) (citation omitted). If the plaintiff makes this showing by a preponderance of the evidence, the burden shifts to the defendant employer to show a legitimate, nondiscriminatory reason for its actions. *Id.* at 1221 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant makes this showing, the burden shifts back to the plaintiff to "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Lewis*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 256).

"The inquiry into pretext requires the court to determine, in view of all the evidence, 'whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct.'" *Crawford*, 529 F.3d at 976. A pretextual reason is not only one that is false but one that conceals an actual, discriminatory reason. *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

## 1. Failure to Promote Claims

Both the Dean Position Claim and the Coordinator Position Claim are failure-to-promote claims. To show a *prima facie* case for such a claim, Dr. Ahmed must demonstrate "(1) he . . . is a member of a protected minority; (2) [he] was qualified for and applied for the promotion; (3) [he] was rejected despite these qualifications; and (4) other equally or less qualified employees who were not members of the protected minority were promoted." *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988). Defendants do not dispute that Dr. Ahmed is part of a protected class

(Asian race, Bangladeshi national origin), (*see* doc. 112 at 32), so the analysis below focuses only on the other three elements.

As an initial matter, Dr. Ahmed claims that he has direct evidence to support discrimination in hiring or promotions, pointing to his testimony that, in previous search committees, "they" (referring to "top administrators of [the] University") "always ask us to give us three [African-American candidates] without ranking them," (Ahmed Depo. I at 44 (170:8-16)), that Dr. Wims has asked if there are any African-American candidates, (*id.* (170:17-23)) and that "the University" has done the same, (*id.* at 45 (175:13-19)). (Doc. 117 at 32). This, Dr. Ahmed says, is an unwritten but *de facto* University policy that the court should consider to have been applied in his case. (*Id.* at 32-33).

If this truly were direct evidence of discrimination, it would dispense with the need to prove a *prima facie* case; Dr. Ahmed would not be relying on circumstantial evidence at all and would not need to take advantage of the *McDonnell Douglas* framework. However, as Defendants point out in their reply, the evidence Dr. Ahmed cites is not actually direct evidence. Direct evidence is evidence that "proves the existence of a fact without inference or presumption." *Jons v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017). But Dr. Ahmed wishes the court to *presume* that the University issues this alleged directive in every case and *infer* that it did so in his as well. This is a far cry from direct evidence, which would establish that, in the specific instance or instances of discrimination Dr. Ahmed complains of, discrimination occurred. *See, e.g., Van Voorhis v. Hillsborough Cty. Bd. of Cty. Comm'rs,* 512 F.3d 1296, 1300 (11th Cir. 2008) (finding direct evidence of age discrimination where employer stated he "didn't want to hire an old pilot"). Accordingly, the undersigned moves on to modes of proof based on circumstantial evidence.

### a. Dean Position Claim

Defendants first contend Dr. Ahmed cannot demonstrate that he was qualified for the Dean Position because his leadership experience "fell far short" of the position's requirements, in the committee's view, thus stumbling at the second and third elements of his *prima facie* case. (Doc. 112 at 32) (citing Walker Decl. at ¶ 10).

It is undisputed that administrative experience was a requirement for the Dean Position (whether one year or three) and that Dr. Ahmed possessed no administrative experience at the time he applied for the Dean Position. Dr. Ahmed attempts to sidestep this by pointing to Dr. Montgomery's statements to him that Dr. Ahmed's technical background, ABET responsibilities, and outside work were, in his opinion, "the equivalent of, or exceeded the requirements of the Dean position."[20] (Doc. 117 at 27). What Dr. Ahmed does not do, however, is explain why Dr. Montgomery's statements to him bound the committee (or this court) to draw the same analogy. The closest Dr. Ahmed comes is his contention Dr. Montgomery "guarantee" it would be taken into account, (doc. 117 at 34), but Dr. Ahmed supplies no evidence to support that Dr. Montgomery had any power to enforce this guarantee. Further, although Dr. Ahmed points to Dr. Montgomery's status on the committee as a non-voting member as an "irregularity," (doc. 117 at 27), he does not explain what relevance this has to his claims. Even if Dr. Montgomery was a non-voting member of the committee, he still could have conveyed his opinion of Dr. Ahmed's qualifications to the voting members of the committee. But the committee was not required to accept Dr. Montgomery's equation of Dr. Ahmed's non-administrative qualifications with administrative

---

[20] Defendants point out that these statements are hearsay, but the court will consider them anyway.

experience, whether he was a voting member or not, and Dr. Ahmed cannot rely on Dr. Montgomery's opinion to demonstrate his qualifications.

As to the fourth element, the evidence does not support that either Dr. Glenn (who ultimately received the Dean Position) or Dr. Egarievwe (who was interviewed, but not recommended by the committee) were equally qualified or less qualified than Dr. Ahmed. As Defendants note, Dr. Ahmed does not actually challenge Dr. Glenn's qualifications in his complaint; thus, it is an academic exercise to consider Dr. Ahmed's arguments as they relate to Dr. Glenn (though the court nevertheless considers those arguments). Even if he did, though, Dr. Ahmed's evidence to support that Dr. Glenn was less or equally qualified is Dr. Ahmed's subjective assessment that had he obtained an interview, he "would have far outpaced the qualifications of the person who was chosen," (doc. 117 at 13) (citing Ahmed Decl. at 3 (¶ 22)), and that he had "far more experience serving the HBCU mission than Dr. Glenn," (doc. 117 at 6) (citing, by reference, Ahmed Decl. at 6-8 (¶ 41-56)). But while Dr. Ahmed burnishes his own credentials, their existence cannot eclipse the fact Dr. Glenn had dean-level experience and Dr. Ahmed did not. Accordingly, he has failed to present a *prima facie* case with respect to all three disputed elements as they pertain to Dr. Glenn.

Dr. Ahmed contends Dr. Egarievwe was less qualified because he had no experience in engineering and was only an associate professor. (Doc. 117 at 31). But what Dr. Egarievwe did have was experience as a chair. Dr. Ahmed attempts to diminish this by stating Dr. Egarievwe's "assignment had failed as the Technology Department had been closed, and it was folded into the Engineering Department." (*Id.*). This is a question of the subjective value to the committee of Dr. Egarievwe's experience to the committee, not a question of whether he had that experience to begin with. And since Dr. Ahmed simply cannot show he had the administrative experience Dr.

Egarievwe had, Dr. Ahmed cannot satisfy his *prima facie* case's fourth element with respect to the committee's decision to interview Dr. Egarievwe.[21]

Although Dr. Ahmed has failed to make out a *prima facie* case as to either Dr. Glenn or Dr. Egarievwe, Dr. Ahmed's evidence of pretext would also fall short.[22] Dr. Ahmed's pretext evidence consists of four parts: (1) his allegations of an unwritten policy of discrimination (i.e., his "direct" evidence of discrimination), (doc. 117 at 32-33); (2) his contention that the reasons given for failing to select Dr. Ahmed are "unworthy of credence," (*id.* at 33); (3) "inconsistencies and contradictions" in the University's account, (*id.* at 34-38); and statistical evidence of discrimination, (*id.* at 39). As to the allegedly unwritten policy, while Dr. Ahmed characterizes it as "ubiquitous," his vague testimony offers neither specific instances on which it is said to have been applied nor any reason to conclude that an inquiry about whether there were African-American candidates warrants the inference that the University discriminates in favor of African-American candidates to the exclusion of others. And there is no evidence to support that Dr. Wims, the only administration figure to whom Dr. Ahmed attributes these inquiries, weighed in on either the Dean Position or the Coordinator Position. Instead, the uncontroverted evidence is that Dr.

---

[21] Dr. Ahmed suggests that the committee "arbitrarily determined" to interview the top three candidates instead of the top four, which he says (based on his hearsay evidence of the committee's inner workings) would have qualified him for an interview. (Doc. 117 at 30). Leaving aside that any dividing line in selecting candidates for interviews could be characterized as arbitrary, Dr. Ahmed's lack of administrative experience versus the administrative experience of the interviewed candidates is undisputed.

[22] For the purposes of this section, the court assumes that Dr. Ahmed could have made out a *prima facie* case, but that Defendants lack-of-administrative-experience argument met their burden to show a legitimate, nondiscriminatory reason for failing to interview Dr. Ahmed.

Wims did not do so, whether by participating in the committee's meetings or deliberations, reviewing applications, or selecting finalists.[23]  (Wims Depo. at 13 (39:10-18)).

This is also not a case where the proffered reasons for the failure to interview or promote are so "unworthy of credence," *see Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012), that the question should go to a jury.  It is undisputed that Dr. Ahmed had no administrative experience.  It is also undisputed that the candidates who advanced through the process *did* have administrative experience, whether Dr. Ahmed thinks it is valuable administrative experience or not.  None of Dr. Ahmed's efforts to discount this requirement hold water.  Dr. Ahmed points to Dr. Saha, an Asian candidate with administrative experience, but the undersigned cannot speculate why the committee ranked him lower than the top three candidates (or, for that matter, than fourth-ranked Dr. Ahmed); nothing in the record suggests that chair-level experience, while a requirement, was the *only* metric on which candidates were evaluated, and there is no evidence at all regarding the University's reasons for not advancing Dr. Saha through the process. While Dr. Ahmed again highlights Dr. Montgomery's statements regarding his supposedly equivalent experience, comparing them to Dr. Walker's conclusion that Dr. Ahmed's application fell "far short in the area of leadership experience," (*see* doc. 117 at 33-34), the most this demonstrates is a difference of opinion between two University faculty members as to Dr. Ahmed's qualifications.  Again, there is no evidence Dr. Montgomery's "guarantee" had any

---

[23] The three committee members' hearsay statements in Dr. Ahmed's declaration are that they were "to agree with Dr. Walker and to go along with him in decision-making because he was carrying out the requirements of the Provost."  (Ahmed Decl. at 4 (¶ 27)).  The court is left to speculate as to how this instruction was conveyed to the committee members and what the committee members' understanding of "the requirements of the Provost" entailed.  In any event, it does not contradict Dr. Wims's testimony.

binding force on any committee member.  Dr. Ahmed also points to the budgeting experience reflected on his resume, (doc. 117 at 37-38) (citing doc. 118-1 at 5 (¶ 33), 14), but this is another attempt to draw an equation between chair experience he demonstrably did not possess and what he considers equivalent experience.  When a plaintiff attempts to show pretext by calling into question another applicant's qualifications, he "must show that the disparities between the successful applicant's and his own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'"  *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (citation omitted).  Dr. Ahmed has failed to do so here.

Dr. Ahmed's allegations of "inconsistencies and contradictions" are no more convincing. Dr. Ahmed's testimony that the one-year-chair-experience posting he had been provided was different from the three-year-chair-experience posting ultimately produced by Defendants, which he cites as an "inconsistency" or evidence of "contradictory documentation," (doc. 117 at 34), is beside the point when it is undisputed he did not meet either requirement.  Dr. Ahmed also attempts to cast doubt on Dr. Walker's declaration, which highlights that the "first question on the list" of questions for Dean candidates is a question about administrative experience and characterizes this as a reflection of its importance, (doc. 113-5 at 5 (¶ 11)) (citing doc. 113-5 at 165 (Exh. D), by contrasting it with what he says was the actual first question asked at Dr. Glenn's interview, which relates to his experiences with HBCUs, (*see* doc. 118-6 at 1).  (Doc. 117 at 35).  According to Dr. Ahmed, this means that experience with HBCUs (which he possessed at the time) was really the most important criterion to the committee.  (*Id.*).  The first question on Dr. Walker's list asks: "Describe your past experience as an administrator managing and working with faculty from multiple disciplines."  (Doc. 113-5 at 165 (Exh. D).  Contrary to Dr. Ahmed's argument, the

interview notes Dr. Ahmed cites do not actually include the actual questions asked, and instead the excerpt Dr. Ahmed has provided simply refers to "Question #1," "Question #2," and "Question #3." (*See id.*). However, the answers track the questions on Dr. Walker's list. Following "Question #1," the summary states "share a bit more about your experience working with HBCUs (challenges or non-challenges)." (*Id.*). But the summary of Dr. Glenn's response to the first asked question—*inter alia*, "a braod [sic] view of working with faculty, students, administrators, etc.[,] managing faculty from the graduate office," "strong arts programs, science strong, sustainability here, developed new graduate programs, phd programs," "develop[ing] budgets," and "ran a center in which faculty members from own department and also from departments all across the university as well as from outside the university"—specifically responds to the substance of Dr. Walker's first listed question. The court cannot accept Dr. Ahmed's inference that this question did not relate to administrative experience, and his argument does not undermine the University's legitimate, nondiscriminatory reason for failing to interview Dr. Ahmed.[24]

Finally, Dr. Ahmed relies on what he terms statistical evidence of discrimination. This is his contention in his declaration that "there have been no Asians or Caucasians promoted or hired into any position of Dean or above" since the advent of the Hugine administration; instead, the only two Dean hires have been African-American, one of whom is Dr. Glenn. (Ahmed Decl. at 8-9 (¶¶ 57-60)). In other words, half of the "statistical" evidence of discrimination Dr. Ahmed

---

[24] Dr. Ahmed recaps his HBCU bona fides in an effort to show that, because the most important question asked of Dr. Glenn was allegedly about HBCU experience, his qualifications were superior. (Doc. 117 at 35-37). But since the evidence does not support that the most important criterion in interviewing Dr. Glenn was HBCU experience, it is difficult to see the value of this information.

highlights is one of the exact instances he is trying to prove was discriminatory.  Dr. Ahmed cannot

show pretext by putting the cart before the horse in this way.  Further, Dr. Ahmed does not explain

why it would be appropriate to extrapolate a pattern[25] of discrimination from two data points, and

the undersigned declines the invitation to do so.

Since Dr. Ahmed cannot make out a *prima facie* case, nor could he show pretext, as to the

Dean Position Claim, his disparate treatment claims founded on it fail.

### b.  Coordinator Position Claim

Defendants primarily base their argument as to the Coordinator Position on the fact Dr.

Ahmed cannot show he applied for it; thus, they reason he cannot meet the second element of his

*prima facie* case.  (Doc. 112 at 32).  Dr. Ahmed responds that he had no opportunity to apply for

the position because it was not posted.  (Doc. 117 at 26).  Since that is the case, Dr. Ahmed

contends all he had to show was that he was interested in the position.  (*Id.*).  This is the

"informality exception" articulated by the Eleventh Circuit in *Carmichael v. Birmingham Saw

Works*, 738 F.2d 1126, 1132–33 (11th Cir. 1984).  Under this formulation, "when there is no formal

mechanism for a plaintiff to apply for a job, a plaintiff makes out a prima facie case 'as long as he

establishes that the [employer] had some reason or duty to consider him for the post,'" and an

employer "cannot avoid a Title VII violation by showing that it incorrectly assumed that the

plaintiff was uninterested in the job."  *Smith v. Thomasville Georgia*, 753 F. App'x 675, 690 (11th

Cir. 2018) (citing *Carmichael*, 738 F.2d at 1133-34).

---

[25] Dr. Ahmed does not raise any pattern-or-practice claims, nor, as a private plaintiff, could he do so.  *See Rollins v. Alabama Cmty. Coll. Sys.*, 814 F. Supp. 2d 1250, 1316 (M.D. Ala. 2011) ("In *Davis v. Coca–Cola Bottling Co.*, 516 F.3d 955 (11th Cir. 2008), the Eleventh Circuit held that a private litigant cannot maintain a pattern or practice claim unless it is brought as a class action and the class is ultimately certified.").

The undisputed evidence is that the position was not a new appointment and that the University simply changed the name of the position rather than promoting Dr. Ayokanmbi to a new position. (*See* Glenn Depo. at 9:11-13:22). This eliminates Dr. Ahmed's ability to complete his *prima facie* case by showing he applied for the position. However, even if the undersigned assumes Dr. Ahmed has made out a *prima facie* case for the Coordinator Position via the *Carmichael* exception, his claims of pretext are solely based on his own qualifications. As Dr. Ahmed himself notes, a plaintiff can generally not prove pretext simply by arguing he is more qualified. (Doc. 117 at 27) (citing *Licausi v. Symantec Corp.*, 378 F. App'x 964, 966 (11th Cir. 2010)). Although Dr. Ahmed again cites his credentials, comparing them to Dr. Ayokanmbi's allegedly shabbier ones, "[a]bsent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext." *Springer*, 509 F.3d at 1349 (citation and internal quotation marks omitted). Defendants deny the position was ever open at all, but rely on Dr. Glenn's testimony that had he made a decision regarding the Coordinator Position, that "Dr. Ayokanmbi's graduate degrees are more in line to the subject matter in the program, and he taught courses in the program." (Doc. 119 at 7). Dr. Ahmed points to no evidence supporting that the hiring criteria for the Coordinator Position, assuming there was a hire at all, functioned as a mask for discrimination.

As with the Dean Position, Dr. Ahmed claims inconsistent explanations for the decision to select Dr. Ayokanmbi point to a situation where Defendants' explanation is "unworthy of credence." (Doc. 117 at 28). The evidence he relies on is allegedly conflicting testimony and interrogatory responses as to who actually placed Dr. Ayokanmbi in the Coordinator Position, Dr.

Glenn or Dr. Montgomery.[26] (*Id.*). Dr. Ahmed's citation of *Reeves v. Sanderson Plumbing Prod.,*

*Inc.*, 530 U.S. 133 (2000), proves why relying on this inconsistency is misplaced. In *Reeves*, the

Supreme Court stated that "in appropriate circumstances, the trier of fact can reasonably infer from

the falsity of the explanation that the employer is dissembling to cover up a discriminatory

purpose." *Id.* at 147. Dr. Ahmed cites this line, (doc. 117 at 28), but omits the next: "Such an

inference is consistent with the general principle of evidence law that the factfinder is entitled to

consider a party's dishonesty about a **material** fact as affirmative evidence of guilt." *Reeves*, 530

U.S. at 147 (citation and internal quotation marks omitted, emphasis added). Regardless of

whether Defendants offered inconsistent explanations, the person who made the selection is not

material to the reason why the selection was made. In other words, it would do nothing to eliminate

the employer's justification and suggest that "discrimination may well be the most likely

alternative explanation." *Id.*

Defendants are due summary judgment on each of Dr. Ahmed's Coordinator-Position-

related disparate treatment claims.

## 2. Pay-Related Claims

### a. Supplemental Pay Claim

In their brief, Defendants argue that Dr. Ahmed's Supplemental Pay claim is not part of

his EEOC charge and that he has failed to exhaust it. (Doc. 112 at 29). Failing that, they contend

the Supplemental Pay Claim cannot succeed on its merits. (*Id.* at 37). Although Dr. Ahmed

---

[26] This conflict apparently stems from the parties' differing understandings of how Dr. Ayokanmbi came into his position. As discussed above, Defendants contend Dr. Montgomery made the initial decision to hire Dr. Ayokanmbi into the Coordinator Position's predecessor position, and that the Coordinator Position was simply the same position. (Doc. 112 at 34).

characterizes the Supplemental Pay Claim as part of his EEOC charge, (doc. 117 at 24-25), he does not defend the merits of the claim, (*see* doc. 117 at 25-42).[27]  Therefore, he has abandoned the Supplemental Pay Claim.  *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (dismissing undefended claims on summary judgment); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").  Since the claim has been abandoned, it is unnecessary to analyze whether it is encompassed by the EEOC charge. Defendants are entitled to summary judgment on the disparate treatment claims based on the Supplemental Pay Claim.

### b.  Summer Assignment Claim

Defendants contend Dr. Ahmed cannot establish either an adverse employment action or that comparator employees were treated more favorably to make out a *prima facie* case as to the Summer Assignment Claim.  (Doc. 112 at 36-39).

Dr. Ahmed argues he was subjected to an adverse employment action in the form of a reduction in pay because the University reneged on its commitment to provide him with summer assignments, and the accompanying 2/9 salary, in perpetuity.  (Doc. 117 at 38-39).  Defendants

---

[27] Some of Dr. Ahmed's contentions related to the Supplemental Pay Claim—for example, arguments regarding his insufficient SCH, discussed below—blend into his Summer Assignment Claim arguments, but he says nothing about the specific acts of discrimination related to the denial of supplemental pay in January 2013.

admit that the Second Salary Letter's "reference to 'a summer assignment' arguably entitled Plaintiff to **one** summer assignment the following summer." (Doc. 112 at 36) (emphasis in original). The crucial word in Defendants' admission is not the one they have emphasized; instead, it is the arguable nature of the assignment that matters here. The summer assignment is included in the same sentence as the salary increase; only in the next sentence, separate from the salary increase, does Dr. Wims implicate University policy. Additionally, Dr. Ahmed's declaration supports that Dr. Montgomery informed him that the handwritten calculation at the bottom of the letter—"$92,000 + 2/9*92,000 = $112,444.44"—would be the amount the University would budget each year for Dr. Ahmed's salary. (Ahmed Decl. at 9 (¶¶ 62-64), 45 (Exh. C)). Although Defendants point to the Handbook's policies regarding summer assignments, (doc. 112 at 36; doc. 119 at 11), they do not account for the actual text of the Second Salary Letter, nor for Dr. Montgomery's handwritten calculation. Just as it is arguable that the Second Salary Letter promised only one summer assignment, it is also arguable that it promised more than Defendants claim. Consequently, there is a genuine dispute of material fact as to whether Dr. Ahmed suffered an adverse employment action when Dr. Glenn denied him summer assignments beyond the 2014 summer term.

That said, because Dr. Ahmed cannot demonstrate that comparators were treated differently, he stumbles at the final *prima facie* hurdle. A recent Eleventh Circuit decision has clarified that, at the *prima facie* stage, a plaintiff must show he and his "proffered comparators were 'similarly situated in all material respects.'" *Lewis*, 918 F.3d at 1218.[28] Neither of Dr.

---

[28] Although *Lewis* articulated a new standard, the court noted that it was not "really breaking new ground" with the "all material respects" formulation. 918 F.3d at 1227 n.12. In

Ahmed's proposed comparators fit the bill. Dr. Ahmed's first comparator is Dr. Vines, an African-American, non-Bangladeshi, non-Asian professor in Dr. Ahmed's department. Dr. Ahmed's allegations regarding Dr. Vines come from a single paragraph in Dr. Ahmed's declaration in which he states he is familiar with Dr. Vines, that Dr. Vines is in the same College with the same supervisor, and that Dr. Vines received summer teaching assignments in years Dr. Ahmed did not. (Ahmed Decl. at 10 (¶ 67)). Dr. Ahmed relies solely on the fact that Dr. Vines is in the same department, with a similar job and the same supervisor. (Doc. 117 at 40). However, this is not sufficient to establish that he is similarly situated in *all* material respects. Dr. Ahmed testified he does not know the enrollment in Dr. Vines's summer classes or Dr. Vines's compensation arrangement, (Ahmed Depo. II at 155:11-23), and there is no record evidence of either of these. Without some information about either of these, the undersigned cannot assess whether Dr. Vines is simply teaching summer assignments consistent with the Handbook (in which case a comparison to Dr. Ahmed would be off base) or is being allowed to deviate from the Handbook guidelines (in which case a comparison to Dr. Ahmed, who does not deny it would be required for him to teach summer classes, would be apt). *See Lewis*, 918 F.3d at 1227 (noting similarly situated comparators "will have been subject to the same employment policy, guideline, or rule as the plaintiff").

Dr. Ahmed's second comparator, Dr. Adams, fares even worse. As noted above, the evidence indicates Dr. Adams (by agreement) only received one summer assignment in 2014, a

---

doing so, it cited one of the cases Dr. Ahmed ultimately relies upon for the appropriate standard as a "cluttered . . . up" version of the same concept. *Lewis*, 918 F.3d at 1227 n.12 (citing *Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997), also cited by Dr. Ahmed (*see* doc. 117 at 40)). While *Lewis* ultimately rejected the harsher "nearly identical" standard cited by Defendants, (*see* doc. 112 at 38-39), this is immaterial since the undersigned finds Dr. Ahmed cannot survive the more lenient *Lewis* standard.

year in which Dr. Ahmed also received a summer assignment. So regardless of whether Dr. Ahmed and Dr. Adams are similarly situated or not, Dr. Adams is not an appropriate comparator because he and Dr. Ahmed were treated the same by the University. Since Dr. Ahmed has not identified any valid comparators, he cannot show a *prima facie* case related to the Summer Assignment Claim.

Even if Dr. Ahmed could show a *prima facie* case, he could not show pretext. Dr. Glenn testified that he emailed Dr. Ahmed on March 29, 2014, indicating the 2014 summer teaching assignment would be Dr. Ahmed's last for budgetary reasons. (Glenn Depo. at 13-14 (41:1-42:9)). Dr. Ahmed has not put Defendants' legitimate, non-discriminatory budgetary justification into question. Dr. Ahmed repeatedly refers to the summer assignment as a commitment or a promise, (*see* doc. 117 at 41), but even accepting that the University broke its promise, this does not show it did so for reasons other than the budget or demonstrate any sort of discriminatory motive. It is Dr. Ahmed's burden to show not just that the University's reason was false, but that it conceals a discriminatory reason. *Brooks*, 446 F.3d at 1163. Further, his attempt to show that Dr. Adams's negotiated a one-year waiver from the SCH requirement is evidence of discriminatory motive, (doc. 117 at 41), is inapt; Dr. Ahmed's failure to meet the SCH requirement is the reason he was denied supplemental pay for FE review courses, not summer assignments. Regardless of whether both agreements were negotiated, each implicates a different University policy; Dr. Ahmed cannot show the budget-based denial of summer assignments was pretextual by pointing to a waiver of a non-budget-based requirement in a different year (operating under a different calendar year budget) in which Dr. Ahmed himself received a summer assignment. *See Lewis*, 918 F.3d at 1227.

Dr. Ahmed's remaining pretext argument also mistakes the evidence. Dr. Ahmed points to the budget justification as a "shifting and inconsistent" reason for denying Dr. Ahmed's 2015

34

summer assignment, which they say is sufficient to find pretext.  (Doc. 117 at 42) (citing *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004)).  In support, Dr. Ahmed cites an affidavit submitted to the EEOC from University counsel that indicated the reason Dr. Ahmed did not receive a summer assignment was that, although counsel had been authorized to inform Dr. Ahmed that a summer assignment was available in 2015, counsel failed to send the message.  (Doc. 117 at 42) (citing doc. 118-5).  Instead, the message had remained in counsel's outbox.  (*Id.*).  However, as Defendants note, this is not a shifting reason for a *denial* of a summer assignment.  (Doc. 119 at 13 n.4).  Instead, the affidavit supports that the University eventually decided to offer Dr. Ahmed a summer assignment on March 9, 2015, almost a year after Dr. Glenn's email denying Dr. Ahmed's original request for a summer assignment and following a subsequent request by Dr. Ahmed's counsel for a summer assignment.  (*See* doc. 118-5 at 2).  Dr. Ahmed's attempt to connect this offer to the March 29, 2014 denial by Dr. Glenn is misplaced and cannot save his Summer Assignment Claim.  Accordingly, Defendants are entitled to summary judgment on Dr. Ahmed's disparate treatment claims based on the Summer Assignment Claim.

### 3. Retaliation

Title VII bars an employer from retaliating against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  To establish a *McDonnell Douglas prima facie* case of Title VII or § 1981 retaliation, a plaintiff must show that "(1) he engaged in statutorily protected expression, (2) the employer took action that would have been materially adverse to a reasonable employee, and (3) there was some causal relation between the two events."  *Worley v. City of Lilburn*, 408 F. App'x 248, 250 (11th Cir. 2011) (citing *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir. 2001)).

Defendants implicitly concede that Dr. Ahmed's 1999 EEOC charge and 2013 EEOC charge are both instances of protected conduct, but argue Dr. Ahmed cannot show the second and third of these for his retaliation claims against the Board (for denying him the Coordinator Position and summer assignments, (doc. 68 at ¶ 54) and Drs. Hugine, Wims, and Glenn (for the summer assignments only, (doc. 68 at ¶ 62).

As far as adverse employment actions, Defendants note, as they did above, that the Coordinator Position was not open, and Dr. Ahmed could not have suffered an adverse employment action as a result of the University's failure to place Dr. Ahmed in that position. (Doc. 112 at 41). Dr. Ahmed does not defend the University's decision regarding the Coordinator Position as actionable retaliation in his response, (*see* doc. 117 at 43), and he has therefore abandoned that claim. As to the Summer Assignment Claim, Defendants raise essentially the same arguments they did above: Dr. Ahmed could not have suffered an adverse employment action because offering him a summer assignment would have contravened University policy. (Doc. 112 at 41). Since there is a factual dispute as to whether the University, via Dr. Wims, offered Dr. Ahmed a continuing summer assignment position irrespective of the University's budget, there is a factual dispute over whether failure to provide summer assignments constituted an adverse employment action.

However, Dr. Ahmed cannot show a causal connection between either EEOC charge and the denial of summer assignments. Defendants point to the delays between the EEOC charges and the summer assignment denial (one year in the case of the 2013 EEOC charge and thirteen years in the case of the 1999 EEOC charge), noting that "in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." (Doc. 112 at 42) (quoting *Thomas v.*

*Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2017)). Dr. Ahmed does not defend his retaliation claim on temporal proximity grounds, but argues other evidence in the record supports it. (Doc. 117 at 44). Specifically, he points to (1) Dr. Wims's allegedly ambiguous statements regarding his knowledge of a prior, ongoing settlement agreement between Dr. Ahmed and the University, (*id.*) (citing Wims Depo. at 15 (48:16-49:4)); and (2) what he contends is "direct evidence" of retaliatory animus—Dr. Glenn's 2015 statement that because Dr. Ahmed was "involved in legal action against the university . . . it would be better if any requests . . . regarding the 2015-16 academic year be submitted to [Dr. Glenn] in writing in lieu of a meeting," (*id.*).

The first of these is a non-starter; Dr. Wims explicitly denied knowledge of the settlement in the portion of his deposition Dr. Ahmed cites, and only stated that he did not know if the settlement should have been brought to his attention. (Wims Depo. at 15 (48:16-49:4)). As Dr. Ahmed's own citations illustrate, a plaintiff may show a causal connection "if he can establish that the decision-maker was aware of the protected conduct at the time of the adverse employment action," (doc. 117 at 44) (citing *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234-35 (11th Cir. 2010)). As in this case, *Krutzig* involved decision-makers whom the evidence showed were unaware of the plaintiff's protected activity. 602 F.3d at 1235. Although Dr. Ahmed seems to argue that knowledge of the prior settlement can be imputed to Dr. Wims because it was in his file and arguably should have been brought to Dr. Wims's attention, he cannot show a causal connection through constructive knowledge. *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1262 (11th Cir. 2001) ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent."). Nor has he adduced any circumstantial evidence to support Dr. Wims's actual knowledge. *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (noting that a plaintiff may establish "[t]he defendant's awareness of the protected

statement . . . by circumstantial evidence") (citation omitted). As for the other University officials, Dr. Glenn testified he was unaware of the 1999 EEOC charge until prior to his deposition, did not recall Dr. Ahmed including it as an attachment to this lawsuit, and had not reviewed Dr. Ahmed's personnel file. (Glenn Depo. at 12 (35:10-17), 31 (111:6-112:5)). Dr. Ahmed points to no evidence suggesting Dr. Glenn was aware of the 2013 EEOC charge when he ended Dr. Ahmed's summer assignments, nor any evidence regarding either charge as to Dr. Hugine.

Dr. Ahmed's other evidence of retaliatory animus is misplaced. First, Dr. Glenn's email references Dr. Ahmed's lawsuit, not either EEOC charge. Although this is protected activity, it is not the protected activity on which Dr. Ahmed bases his retaliation claims. Second, but related, Dr. Glenn's email was sent in January 2015, ten months after Dr. Ahmed was allegedly retaliated against. Finally, even though it references the lawsuit, Dr. Glenn's email does not, as Dr. Ahmed states, cut off conversations regarding a 2015 summer assignment; it redirects them from in-person meetings to written requests. The affidavit from University counsel attached to Dr. Ahmed's motion demonstrates that a written request from his counsel followed on February 19, 2015. (Doc. 118-5 at 1). Dr. Ahmed cannot rely on the email to show a causal connection between Dr. Glenn's Mach 2014 denial of a summer assignment and Dr. Ahmed's 1999 or 2013 EEOC charges. And without a causal connection, Dr. Ahmed's retaliation claim fails.

Further, as discussed above, Defendants have shown legitimate, non-retaliatory reasons for denying Dr. Ahmed summer assignments and the Coordinator Position. Although Dr. Ahmed purports to show retaliatory pretext through the same evidence he cites in support of pretext above, (doc. 117 at 45), this argument makes little sense given that the true motives at issue (retaliation in this context, and race/national origin-based discrimination above) are distinct. In any event,

there is no factual dispute as to pretext on either ground, and Dr. Ahmed's retaliation claims are due to be dismissed.

### 4. Qualified Immunity from § 1981 Claims

In addition to their merits arguments, Defendants argue Drs. Hugine, Wims, and Glenn are protected against individual-capacity liability by qualified immunity. (Doc. 112 at 43-49). "Qualified immunity shields federal and state officials from money damages unless a plaintiff [establishes] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). To take advantage of qualified immunity, the public official must plead it and show that he or she acted within his or her discretionary authority. *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291 (11th Cir. 2009). Once he or she does so, the burden shifts back to the plaintiff to show that qualified immunity should not apply. *Id.* To do so, the plaintiff must show that the public official violated a "clearly established" constitutional or statutory right. *Id.* This is a two-step process (although the steps may be taken in any order): a court must determine whether a constitutional or statutory violation occurred, but also whether the violated right was clearly established at the time of the violation. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Dr. Ahmed does not take issue with the fact that the University officials in question acted pursuant to their discretionary authority. The question then becomes whether they violated his clearly established rights. The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Ashcroft,* 563 U.S. at 742. Thus, in employment discrimination claims, a plaintiff must demonstrate not that his right to be free of discrimination is clearly established, but that the specific conduct at issue violated clearly established law. *Braddy*

*v. Fla. Dep't of Labor & Employment Sec.*, 133 F.3d 797, 801 (11th Cir. 1998).  So long as "the record undisputably establishes that the defendant in fact was motivated, *at least in part,* by lawful considerations," qualified immunity attaches.  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1284 (11th Cir. 2008) (quoting *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1296 (11th Cir. 2000)).

Dr. Ahmed's argument against qualified immunity is, essentially, that he has shown a dispute as to Defendants' motivations for the discriminatory acts he complains of.[29]  (Doc. 117 at 46-47).  But, as discussed above in the pretext context, he has not shown that lawful considerations—Dr. Ayokanmbi's qualifications, in the Coordinator Position Claim (assuming Dr. Ahmed could show the position was available in the first place) and the University's budget, in the Summer Assignment Claim—did not, at least in part, motivate the decisionmakers.[30]  Accordingly, for the same reasons and alternatively to the merits-based conclusions discussed above, Drs. Wims, Hugine, and Glenn are entitled to qualified immunity for Dr. Ahmed's § 1981 claims against them.

---

[29] As discussed above, Dr. Ahmed has abandoned the Supplemental Pay Claim, so the undersigned does not address that claim here.

[30] Defendants argue Dr. Ahmed has not shown that Dr. Hugine took any action that would justify an individual-capacity claim against him.  (Doc. 112 at 47).  Although Dr. Ahmed contends Dr. Hugine's ultimate responsibility for setting faculty pay, as set out in the Handbook, renders him liable for any pay-related decisions, (*see* doc. 117 at 47), it is not necessary to explore this when Dr. Ahmed does not adduce any evidence calling into question that lawful considerations were at least a partial motivation for the Summer Assignment Claim.  And Dr. Ahmed does not actually allege Dr. Hugine's involvement in any sense in the Coordinator Position beyond that he "would be aware" of Dr. Ayokanmbi's placement in the position, which is insufficient to support liability under § 1981 (via § 1983).  *See Iqbal,* 556 U.S. at 677 (rejecting that a supervisor's "mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution").

### B. Promissory Fraud Claim

Dr. Ahmed's final claim is his promissory fraud claim, asserted against Drs. Glenn, Hugine, Wims, and Montgomery. Defendants contend Dr. Ahmed cannot show the elements of promissory fraud, but regardless, all four are entitled to sovereign immunity and state agent immunity. (Doc. 112 at 49-55). Because the undersigned concludes the claim fails on its merits, it is unnecessary to explore whether either immunity would otherwise bar Dr. Ahmed's promissory fraud claim.

Under Alabama law, promissory fraud entails (1) a misrepresentation (in the form of a promise to act or not to act in the future) (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation, along with (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive. *Waddell & Reed, Inc. v. United Inv'rs Life Ins. Co.*, 875 So. 2d 1143, 1160 (Ala. 2003) (citation omitted).

Defendants contend Dr. Ahmed cannot establish that any of the University officials made a promise to Dr. Ahmed that was not kept. (Doc. 112 at 54). To support this, they point to their view of and their earlier arguments regarding the Summer Assignment Claim (i.e., that the Second Salary Letter promised Dr. Ahmed at most one year of summer assignments). (*Id.*). For the reasons discussed above, factual issues might preclude summary judgment if the Second Salary Letter were actually a source of a promise Dr. Ahmed could have relied upon in turning down the Abu Dhabi University offer. But Dr. Ahmed's own testimony supports that he notified Abu Dhabi University that he would not be accepting their offer when he received the First Salary Letter, but prior to receiving the Second Salary Letter. (Ahmed Depo. II at 72:16-19). It would have been

temporally impossible for Dr. Ahmed to rely on any misrepresentation in the Second Salary Letter in doing so.

To attempt to find a way around this, Dr. Ahmed paints the following scenario: he relied on an oral promise by Dr. Wims memorialized in the First Salary Letter, declined the Abu Dhabi offer, later received written confirmation of that promise, and suffered when the University reneged on the promise. (Doc. 117 at 48-47). If this were the case, he might have a reasonable argument for arguing the University's promises in the Second Salary Letter are actionable misrepresentations. But by his own admission, the terms under which he would stay at the University changed between the First Salary Letter and the Second Salary Letter. (Doc. 117 at 48). This is consistent with the text of the First Salary Letter, which states: "I presented the offer we discussed verbally to Dr. Ahmed this morning. **After briefly considering it, he would like to make a counter offer**. He is recommending that the entire $108K become his 9-month salary. He is willing to find his own resources to support himself during the summer. **Please let me know if this is acceptable as soon as possible**." (Ahmed Depo. II at 94 (Exh. 15)) (emphasis added). To the extent Dr. Ahmed contends that the letter and his phone conversation with Dr. Wims (during which Dr. Ahmed communicated his counteroffer and Dr. Wims stated "okay") collapsed into an actionable promise, the letter itself refutes this claim. Nothing in the letter suggests any commitment by the University, by Dr. Wims, or by Dr. Montgomery (to say nothing of Drs. Hugine or Glenn). Instead, the letter is a midpoint in salary negotiations that communicates (1) Dr. Ahmed had received the University's offer, (2) Dr. Ahmed had made a counteroffer, and (3) the University's position on the counteroffer was unknown at the time of the letter. In other words, the letter is clear that the $108,000 figure is Dr. Ahmed's, not the University's. Even coupled

with Dr. Wims's "okay" in response to Dr. Ahmed's communication of his salary demand, no reasonable jury could consider the second letter to be a promise by the University.

Additionally, even accepting that Dr. Ahmed could show the summer assignments were a promise in play at the time he declined the Abu Dhabi University offer, Dr. Ahmed also cannot show any University official intended to deceive him.  Although Dr. Ahmed argues Dr. Wims "utilize[d] the handbook policy to deny Plaintiff his 2/9 summer assignment annual salary" and posits that this shows his intention to deceive, this confuses his claims.  Dr. Ahmed does not adduce any facts to support that Dr. Wims was involved in the decision to deny him a summer assignment; in fact, it was Dr. Glenn whom he claims denied it.   Dr. Wims was arguably involved in denying Dr. Ahmed's supplemental pay for FE review sessions—i.e., the abandoned Supplemental Pay Claim—based on the SCH policy.  But that does not translate to his intent to deceive Dr. Ahmed as to the separate matter of his summer assignments.  Because Dr. Ahmed cannot show intent to deceive or an actionable promise, Defendants are entitled to summary judgment on Dr. Ahmed's promissory fraud claim.

## IV. Conclusion

For the reasons stated above, Defendants' motion for summary judgment, (doc. 111), is due to be **GRANTED**.  Dr. Ahmed's claims are due to be **DISMISSED**.  A separate order will be entered.

DONE this 13th day of February, 2020.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE